UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) No. 1:16-10233 |
| | ) |
| CHARLES W. GARSKE, | ) |
| | ) |
| Defendant. | ) |

**DEFERRED PROSECUTION AGREEMENT**

1. This Deferred Prosecution Agreement (the "Agreement") is made between the Acting United States Attorney for the District of Massachusetts ("USAO") and Defendant Charles Garske ("Defendant").

Acceptance of Responsibility

2. Defendant acknowledges that the USAO has independently developed evidence during its investigation sufficient to establish beyond a reasonable doubt the facts described in the attached Statement of Agreed Facts, and Defendant accepts responsibility for this conduct. Defendant stipulates to the accuracy of Statement of Agreed Facts. Defendant agrees that he will not contest either the admissibility into evidence or the accuracy of the Statement of Agreed Facts in any subsequent criminal proceedings that may occur in the event of a breach of this Agreement. Defendant further agrees that he will not himself or through any agents, including present or future attorneys, make any public statements contradicting any of the facts as set forth in the Statement of Agreed Facts. Any such contradictory statement shall constitute a material breach of this Agreement.

Deferral of Prosecution

3. Absent a material breach by Defendant of his obligations under this Agreement, the USAO will file a dismissal of the charges in the Indictment twelve months after this

Initialed: _____

1

agreement is approved by the Court, and the USAO will bring no additional charges against Defendant relating to the conduct described in the Indictment and the Statement of Agreed Facts.

4. This Agreement does not protect Defendant from prosecution for any crimes except those arising from the conduct described in the Indictment and the Statement of Agreed Facts; it does not apply to any individual or entity other than Defendant.

5. The USAO and Defendant (the "Parties") understand that this Agreement is subject to the Court's approval in accordance with 18 U.S.C. § 3161(h)(2); specifically, the parties must obtain the Court's approval, under the Speedy Trial Act, of the delay of Defendant's trial on the Indictment in order to allow Defendant sufficient time to demonstrate his good conduct. Should the Court for any reason decline to approve the deferral of prosecution, the Parties shall be released from any and all obligations under this Agreement, and this Agreement shall be null and void.

Breach of the Agreement

6. Should the USAO, in its sole discretion, which is not and shall not be subject to appeal or review, determine that Defendant has: (a) knowingly given false, incomplete or misleading information to any law enforcement officials; (b) engaged in any acts that form a basis for finding that Defendant has obstructed or impeded the administration of justice; (c) otherwise knowingly and materially breached any provision of this Agreement; or (d) committed any crimes before completing all obligations under this Agreement, the USAO may terminate this Agreement by written notice to Defendant.

7. After such notice, the USAO may, in its sole discretion, prosecute Defendant for the offenses charged in the Indictment. Moreover, with respect to any prosecution of the charges in the Indictment or of offenses based on conduct in the Statement of Agreed Facts that are not

Initialed: [initials]

2

time-barred by the applicable statute of limitations (or any other legal, equitable or constitutional basis upon which a prosecution may be time-barred) as of the date of this Agreement, Defendant agrees to waive venue and any legal or procedural defects in any pertinent charging document related to such offenses or conduct.

8. Defendant agrees that if the USAO determines that Defendant has committed a material breach, Defendant will neither contradict the contents of the Statement of Agreed Facts nor challenge the factual or legal sufficiency of the Indictment.

9. Defendant agrees that the consequences for a breach set forth in this Agreement are remedies to which the USAO is entitled in the event of a breach and shall survive the termination of this Agreement in the event of a breach. Defendant further agrees that the USAO's remedies for a breach are not limited to those set forth in this Agreement. Defendant further agrees that in the event of a breach, Defendant shall nevertheless be bound by his waivers of any legal, equitable or constitutional rights set forth in this Agreement, and those provisions shall survive even in the event of a breach.

Agreement Binding Only on Defendant and USAO

10. The Parties understand and acknowledge that this Agreement is binding on Defendant and the USAO, but specifically does not bind any other components of the U.S. Department of Justice, federal agencies, or any state or local law enforcement or authorities. Further, the waivers and other agreements made by Defendant herein shall not be binding upon Defendant in any civil or criminal proceeding initiated by any state or local government.

Miscellaneous

11. Nothing in this Agreement restricts in any way the ability of the USAO to proceed against any individual or entity not a party to this Agreement.

Initialed: _____

3

12.     Defendant and the USAO agree that this Agreement, including the attached Statement of Agreed Facts, shall be made available to the public.

13.     This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which taken together shall constitute one and the same Agreement. Signatures of the Parties transmitted by facsimile or e-mail shall be deemed to be their original signatures for all purposes.

Complete Agreement

14.     This Agreement, including the attached Statement of Agreed Facts, constitutes the entire agreement between the Parties, and supersedes all prior agreements or understandings, both oral and written, with respect to the subject matter hereof and the disposition of this case. No promises, representations or agreements have been made other than those set forth in this Agreement. This Agreement can be modified or supplemented only in a written memorandum signed by the Parties or by express agreement of the Parties on the record in court.

SO AGREED.

Initialed: 

4

NATHANIEL R. MENDELL
Acting United States Attorney

By: /s/ Stephen E. Frank (mq)
STEPHEN E. FRANK
Chief, Securities, Financial & Cyber Fraud Unit
SETH B. KOSTO
Deputy Chief, Securities, Financial & Cyber Fraud Unit
MACKENZIE A. QUEENIN
Assistant United States Attorney

Date: 12/24/21

5

Initialed: [signature]

## ACKNOWLEDGMENT OF DEFERRED PROSECUTION AGREEMENT

I have read the Deferred Prosecution Agreement, including the attached Statement of Agreed Facts, in its entirety and discussed it with my attorneys. I hereby acknowledge that it fully sets forth my agreement with the United States Attorney's Office for the District of Massachusetts. I further state that no additional promises or representations concerning the disposition of this case have been made to me by any official of the United States. I acknowledge that the terms and provisions of this Agreement have been fully explained to me, including, without limitation: the legal, equitable and constitutional rights I am waiving under this Agreement; that I have had a full and complete opportunity to consult with legal counsel and to ask any questions about the terms and provisions of this Agreement; that I fully understand the terms and provisions of this Agreement; that my agreements and waivers stated herein are knowing and voluntary and are made with the advice of counsel; and that I am satisfied with the legal representation provided by my legal counsel. I am entering into this Agreement freely, voluntarily, and knowingly.

CHARLES GARSKE
Defendant

Date: 12/22/21

I certify that Charles Garske has read this Deferred Prosecution Agreement, including the attached Statement of Agreed Facts, and that I have discussed its meaning with him. I believe he understands the Agreement and is entering into it freely, voluntarily, and knowingly.

Justine Harris, Esq.
Attorney for Defendant

Date: 12/22/21

Initialed:

6

Attachment A – Statement of Facts

1.   Institutional investors often own shares in many different publicly traded companies (or "issuers") and, as a result, are called upon to vote on numerous shareholder proposals each year—including, for example, proposals relating to the election of directors, executive compensation, and mergers and acquisitions. Shareholder proposals are typically described in an issuer's proxy materials, and votes must be cast at or before the issuer's annual shareholder meeting.

2.   Many institutional investors retain proxy advisory firms to provide them with research, analysis and recommendations concerning shareholder proposals. Proxy advisory firms may also engage in ancillary businesses, including helping their clients actually cast their votes.

3.   Proxy solicitation firms assist publicly traded companies in matters requiring shareholder approval by attempting to gather information about institutional investors' holdings, and the direction of their proxy votes, even as the votes are being cast (and, on occasion, after the votes are cast but before they are made public). This information is valuable, among other reasons, because it provides proxy solicitors, and their clients, with early insight into whether particular shareholder proposals are likely to pass or fail, and can thus help to shape their strategies for affecting the outcome of shareholder votes.

4.   There are a number of ways in which proxy solicitation firms may attempt to determine the direction of votes by particular institutional investors. For example, they can contact the institutional investors directly and ask whether and how they have voted on particular proposals. Some institutional investors will share such information with proxy solicitors, but some will not. At relevant times, Georgeson, LLC ("Georgeson") was one of the leading proxy solicitation firms in the United States. Georgeson was based in New York, New York, and maintained back-office operations in Canton, Massachusetts, where its email and billing servers were located.

5.   At relevant times, Institutional Shareholder Services ("ISS") was one of the leading proxy advisory firms in the United States, with offices in Boston, New York and elsewhere.

6.   From in or about and between November 1991 and October 28, 2011, Charles W. Garske was employed by Georgeson, in various roles based in New York. In his role as a senior managing director, Garske was responsible, among other things, for advising Georgeson's publicly traded clients on matters requiring shareholder approval.

7.   At relevant times, Michael Sedlak was employed by Georgeson as a member of the firm's Institutional Services Group ("ISG"), based in New York. As a member of the ISG, Sedlak conducted research into shareholder votes affecting Georgeson's clients.

8. At relevant times, Brian M. Zentmyer, also known as Brian M. Bennett ("Zentmyer"), was employed in various positions by ISS. As an ISS employee, Zentmyer owed a duty of honest services to ISS, and was subject to ISS's code of conduct, which among other things prohibited employees from (1) accessing confidential information about ISS's clients unless necessary to perform their job responsibilities; (2) providing confidential client information to third parties; and (3) accepting gifts or entertainment "that appears designed to induce an employee to act in a manner inconsistent with the best interests of [ISS]."

9. In the course of his work for ISS, Zentmyer had access to nonpublic information concerning ISS's clients. The information included how many shares the clients held in particular issuers, whether the clients had voted on particular shareholder proposals, and if so, how they had voted. ISS's contracts with its clients typically included provisions requiring that ISS not disclose this type of information to third parties. ISS took steps to protect this information, which was itself confidential to ISS.

10. At various times, Garske and others at Georgeson asked Sedlak to obtain information about how various institutions had voted on particular shareholder proposals. Sedlak requested that Zentmyer provide him with information about whether and how certain clients of ISS had voted on the shareholder proposals.

11. Garske was, at minimum, willfully blind to the fact that, in response to Sedlak's requests, Zentmyer accessed ISS's computer systems to obtain the client-specific information Sedlak sought and provided that information to Sedlak in exchange for tickets to concerts and sporting events, in violation of Zentymyer's duty of honest services to ISS. Sedlak forwarded the confidential information he obtained from Zentmyer to Garske and others at Georgeson, who provided it to the firm's clients.

12. In several instances, Garske and others permitted Sedlak to bill at least a portion of the cost of some of Zentmyer's tickets to clients of Georgeson and provided Sedlak with the names of clients to bill. In those instances, the invoices described the ticket charges as "courier services" or other legitimate-sounding expenses.